UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


RIVER FARM REALTY TRUST,      )
PAUL DERENSIS, and            )
LINDA DERENSIS                )
                             )
            Plaintiffs,       )      CIVIL ACTION NO.
                             )      16-cv-12386-DPW
                             )
FARM FAMILY CASUALTY          )
INSURANCE CO.                 )
                             )
            Defendant.        )


MEMORANDUM AND ORDER
February 4, 2019

Plaintiffs bring suit against their insurance company for breach of contract and for violations of the Massachusetts Consumer Protection Act, M.G.L. c. 93A, based on a dispute between them concerning an insurance claim for losses caused by the formation of ice dams and subsequent water leakage into their residence. The insurer now seeks summary judgment.

## I. BACKGROUND

### A. *Factual Background*

#### 1. The Parties and the Policies

Plaintiff River Farm Realty Trust ("River Farm") is a nominee realty trust established to hold title to real property located at 262 South Main Street in Sherborn, Massachusetts ("the insured premise"). Plaintiffs Paul and Linda DeRensis reside at the insured premise.

Defendant Farm Family Casualty Insurance Company ("Farm Insurance" or "the insurance company") is licensed to transact the business of insurance in the Commonwealth of Massachusetts.

Farm Insurance issued Special Farm Package "10" Policy No. 2011G1237 ("the River Farm policy"), effective for the period November 15, 2014 to November 15, 2015, to River Farm as the insured entity. The policy provided coverage for the insured premise subject to a limit of liability of $729,987.00 and a $500.00 deductible. This policy did not, however, provide coverage for household contents.[1]

2.   The River Farm Policy

The River Farm policy specified that, in the event of a loss or a claim, "[p]roperty losses are settled on the basis of actual cash value," and, for loss to property, the company would only be liable for the least of the following:

> (a) the applicable limit of liability; (b) an amount not greater than [the insured's] interest in the property; (c) the cost of repairing or replacing the property with materials of equivalent kind and quality to the extent practicable; (d) the amount computed after applying the deductible or other limitation applicable to the loss; or (e) the ACTUAL CASH VALUE of the property at the time of loss (except as provided under the Replacement Cost Provision, if applicable).

---

[1] Farm Insurance separately issued Homeowners Policy No. 20-X-303-52L-6 ("the Homeowners policy"), effective for the policy period November 15, 2014 to November 15, 2015, to Mr. DeRensis as the named insured party. The Homeowners policy provided coverage for both personal property and for loss of use. The terms of that policy, and the coverage it provides, are not at issue in this case.

The term "actual cash value" is defined in the contract to mean "the amount it would currently cost to repair or replace the covered property with new material of like kind and quality, less allowance for physical deterioration and depreciation, including obsolescence."  In addition, the policy also required that, if the insured premise was a residence – as is the case here – the insurance company would pay for additional living expenses for at most 24 months "for the necessary and reasonable increase in living costs [the insured party] incur[s] to maintain the normal standard of living" if "a loss covered by this policy makes the [insured premise] uninhabitable."

If the insured party and the insurance company disagree on the amount of loss, "either one can demand that the amount of the loss be set by appraisal."  In that event, both the insured party and the insurer will select a "competent, independent appraiser" to assess the amount of loss.  If the appraisers agree on the amount of loss, "the amount agreed upon shall be the amount of loss" for which the company is liable.  If the appraisers do not agree, the disagreement shall be submitted to an impartial umpire selected by the appraisers, and the umpire shall determine the amount of loss.  Once the amount of loss is determined, the insurance company is obligated to make a payment for the loss within thirty days.  If the insurance company fails to timely pay the claim once the amount of loss is determined,

it is also liable for "the payment of interest to the [insured party] at a rate of one percent over the prime interest rate on the agreed figure."

The policy also included a Massachusetts-specific amendment that allowed the insured parties to seek a Reference under M.G.L. c. 175 § 99, *et seq.*, in the event of a disagreement about the value of the claim.  The Reference process required the value of the claim to be decided by three uninterested individuals, with the insurance company and the insured party each choosing one Referee, and the two jointly choosing the third.  The Reference process was an alternative to the procedure outlined in the policy and carried the same conditions regarding payment once the process was completed.

### 3.   The Triggering Incident

As a result of a series of snowstorms, ice dams began forming at the insured premise on February 5, 2015.  Due to the freezing and thawing of these ice dams through March 3, 2015, water leaked into and throughout the insured premise. Plaintiffs did not initially call a water mitigation service, though Mr. and Mrs. DeRensis sought help from their employees to shovel snow off their roof and used buckets and towels to contain the flood of water into the premise.

### 4.   The Reported Claim

Sometime in March 2015, Mr. DeRensis contacted Farm

Insurance to notify it about the ice dam and water damage.  On April 27, 2015, Mark Chilton, an adjuster with Farm Insurance, sent Mr. DeRensis correspondence, which stated:

> Mr. DeRensis, I must apologize.  Unfortunately when your claim arrived at Farm Family they were set up as one singular claim where in fact there are two separate and distinct claims being asserted.  Once I had recognized the issue of two claims and separated them a record keeping issue came to light. . . . [T]he independent claim numbers became interchanged. As you can see one minor issue led to a number of problems. . . .  I will work to see you receive our coverage determination ASAP.  Again, I apologize for the confusion and delay.

Farm Insurance assigned Scott Howard to handle Plaintiffs' claim.  On May 4, 2015, Mr. Howard sent Mr. DeRensis a letter with the subject line, "Claim Report Acknowledgment."  This letter did not indicate when the claim was made.  Farm Insurance then assigned Dineley Claims Service, an independent insurance adjusting firm that Mr. Howard had hired in the past, to perform the initial field investigation and loss adjustment.  In turn, Dineley Claims Service assigned Mark Whidden to handle the claim.

On May 20, 2015, Mr. Whidden visited the insured premise and met with Mr. DeRensis.  He inspected the areas of damage brought to his attention, including the roof, and took photographs of the insured premise.  Following his visit, Mr. Whidden prepared an estimate of the costs he believed were necessary to repair the damage he observed, which he mailed to

Mr. and Mrs. DeRensis in June of 2015.  Mr. DeRensis did not agree with the estimate of damage prepared by Mr. Whidden, and testified that his first reaction to the estimate was that "it was a fraud" because the estimate was so low.  On November 13, 2015, Mrs. DeRensis sent a letter to Mr. Whidden regarding the claim.  In her letter, she enclosed three estimates from local contractors for the work she deemed necessary to fix the damage caused by the ice dams and the water leakage.  When Mr. Whidden did not immediately respond to the November 15, 2015 letter, Mrs. DeRensis contacted him by telephone.

On November 24, 2015, Mr. Howard sent Mr. DeRensis an email acknowledging receipt of the estimates that Plaintiffs "were able to obtain within the last couple of weeks."  In response, Mr. DeRensis stated: "Given how badly this claim handling has been botched, I am consulting an attorney this morning, notwithstanding [*sic*] the requests from the adjuster to 'start over' and forget the past."

Concomitantly, Mrs. DeRensis sent an email to Richard Dineley, the President of Dineley Claims Service, about her dissatisfaction with the handling of Plaintiffs' claim, to which he responded: "Dear Ms. DeRensis: I had your claim confused with another we have [*sic*] with a 'Linda' in NJ. . . .  My apologies for the confusion."  In this email, Mr. Dineley reported Bryan Grandmont had been assigned as the new adjuster.  That same day,

Mr. Grandmont followed up with Mrs. DeRensis, acknowledging that Plaintiffs had retained legal counsel, and again apologizing for any confusion there may have been.

On February 16, 2016, after several communications with Farm Insurance, Plaintiffs' legal counsel sent Mr. Howard a preliminary statement of loss and associated estimates, totaling $236,437.60. The scope and pricing reflected in the new contractor's estimates exceeded the estimates previously furnished to Farm Insurance.

A second inspection of the insured premise occurred on March 2, 2016. On March 18, 2016, Farm Insurance received an updated estimate for interior damage from Dineley Claims Service, which it sent to Plaintiffs' legal counsel. On March 23, 2016, Farm Insurance issued payment for the interior damage in the amount of $28,005.21. Plaintiffs' were dissatisfied with this second estimate; Mr. DeRensis thought it was a "joke."

5. <u>The Reference</u>

On March 28, 2016, Plaintiffs' legal counsel demanded a Reference pursuant to M.G.L. c. 175 § 99 *et seq*. From June to July of 2016, a two-day hearing was conducted before a three-member panel of Referees to hear the evidence and determine the extent of loss. On July 20, 2016, the panel issued a unanimous

award, which entitled the Plaintiffs to at most $183,848.00.[2]

Farm Insurance has paid Plaintiffs a total of $137,887.99 – the

actual cash value of the loss to the building set forth in the

award and the amount to which Plaintiffs were entitled under the

terms of the insurance policy.

Plaintiffs have not alleged that they incurred any

additional living expenses; nor have they submitted any

documentation to Farm Insurance to show that repairs have been

performed to the dwelling in excess of the actual cash value

paid or signed a proof of loss statement.

6.    The Demand Letter

In a letter dated September 22, 2016, Plaintiffs' counsel

wrote to the insurance company, invoking M.G.L. c. 93A.  The

letter demanded Farm Insurance pay certain sums of money to

Plaintiffs, including the sum of $129,443.00 as an "Additional

---

[2] The award valued the replacement cost of the building at
$153,208.00 and the building's actual cash value at $137,888.00.
It also valued the personal property lost as a result of the
damage at $4,240.00 and stated that the Plaintiffs were entitled
to any living expenses they actually incurred for up to four
months while repairs were taking place, not to exceed $6,600 per
month.  The $4,240.00 valued the loss to the contents of the
insured premise and falls outside the scope of the policy at
issue.  The contents are, instead, covered by the homeowner's
insurance policy, referenced *supra* in n. 1.  The $183,848.00
value represents the absolute maximum amount to which Plaintiffs
could have been entitled; it is the sum of the building's
replacement value ($153,208.00), the cost to replace the lost
personal property ($4,240.00), and four months living expense at
$6,600 per month (for a total of $26,400.00).

Reference Award."  Farm Insurance responded to the demand letter
on October 21, 2016.  Farm Insurance tendered the sum of
$7,766.58 for the loss of use of the money during the pendency
of the dispute, reflecting interest at 6% on the sum of
$129,443.00, the difference between the Reference award and the
earlier payment.  Though requested by Farm Insurance, there is
no evidence in the record that Plaintiffs signed a release in
exchange for this amount.

**B.    *Procedural Background***

On November 23, 2016, Plaintiffs filed this complaint
against Farm Insurance.  They amended their complaint on March
3, 2017.  The complaint alleges that Farm Insurance breached its
contract and violated of M.G.L. c. 93A.

In due course, Farm Insurance filed the present motion for
summary judgment.  Farm Insurance argues that it complied fully
with its obligations under the insurance contract at issue here
and that the evidence of record does not show an absence of good
faith or the presence of extortionate tactics giving rise to
liability under chapter 93A.

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that
there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law."  Fed. R.
Civ. Pro. 56(a).  "As a prerequisite to summary judgment, a

moving party must demonstrate 'an absence of evidence to support the non-moving party's case.'" *Barbour* v. *Dynamics Research Corp.*, 63 F.3d 32, 37 (1st Cir. 1995) (quoting *Celotex Corp.* v. *Catrett,* 477 U.S. 317, 325 (1986)). "Once the moving party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.'" *Id.* (quoting *Anderson* v. *Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986)). The facts are viewed "in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor. *Id.* at 36.

### III. ANALYSIS

Farm Insurance argues that it did not breach the insurance contract because it has paid everything owed under the contract when those amounts became due. It further contends that Plaintiffs' claims under c. 93A fail as a matter of law because the conduct at issue is not, in and of itself, actionable under c. 93A and because Plaintiffs have suffered no distinct injury or harm.

The interpretation of an insurance contract is a question of law. *Allmerica Fin. Corp.* v. *Certain Underwriters at Lloyd's, London*, 871 N.E.2d 418, 425 (Mass. 2007). "An insurance contract is to be interpreted 'according to the fair

and reasonable meaning of the words in which the agreement of the parties is expressed.'" *Id.* (quoting *Cody* v. *Connecticut Gen. Life Ins. Co.,* 439 N.E.2d 234, 237 (Mass. 1982)). Ambiguities in the insurance contract are interpreted against the insurance company, and the insurer "has the burden of proving the applicability of a particular exclusion." *Id.* However, "[the] insured generally bears the burden of proving that a particular claim falls within a policy's coverage." *Id.* (internal citations omitted).

## A. *Breach of Contract Claim*

To recover under a breach of contract claim, a plaintiff must prove that "(1) an agreement was made between the plaintiff and the defendant supported by valid consideration . . . (2) the plaintiffs have been ready, willing, and able to perform; (3) the defendant's breach has prevented them from performing . . .; and (4) the plaintiffs have suffered damage." *Singarella* v. *City of Boston,* 173 N.E.2d 290, 291 (Mass. 1961) (internal citations omitted).

Under the terms of the policy, as amended to conform with Massachusetts law, the insurance company is not required to pay the loss in the absence of an agreement or an award pursuant to a Reference. Because the parties here were unable to come to an immediate agreement with respect to the amount of loss due to Plaintiffs, Plaintiffs demanded a Reference that produced a

total award of $183,848.00, categorized by the type of loss. Specifically, the Reference award indicates that the "Building Actual Cash Value" is $137,888.00, and the parties do not dispute that Farm Insurance paid Plaintiffs this amount.

However, Farm Insurance is not liable for any value above the actual cash value of the building under the terms of the policy, which states that "[p]roperty losses are settled on the basis of ACTUAL CASH VALUE" and which specifically excludes personal property from its scope of coverage.[3] Moreover, under the policy, the insurance company is liable for additional living expenses only when the residence is uninhabitable. The Reference award valued these expenses, if applicable, at $6,600 per month for at most four months. Plaintiffs concede that they have not incurred any additional living expenses. Consequently, Farm Insurance is not obligated to pay this amount.

Accordingly, Farm Insurance satisfied its payment obligations under the policy. Because Farm Insurance has shown that there is no genuine dispute as to any material fact regarding this claim, it is entitled to judgment as a matter of law with respect to Plaintiffs' breach of contract claim.

_____

[3] Personal property is covered by a separate homeowner's insurance policy. *See supra* n. 1.

***B.   The Chapter 93A Claim***

In their amended complaint, Plaintiffs allege that Farm Insurance "violated the provisions of G.L. c. 176D § 3(9) and, as a consequence, has violated the provisions of G.L. c.93A § 9 and 11."

<u>1.</u>   <u>Chapter 93A</u>

Massachusetts General Laws chapter 93A section 2(a) provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" are unlawful.[4]  To enforce this prohibition, Massachusetts law provides private parties with a right of action for damages.  The statute, however, distinguishes between two classes of plaintiffs who may bring suit, and the two sections creating these rights of action are mutually exclusive. "[S]ection 11 entitles '[a]ny person who engages in the conduct of any trade or commerce' to bring an action for unfair or deceptive practices, whereas section 9 grants essentially the

_____

[4] By its plain text, the statute requires that, for Plaintiffs to recover, the Defendant must be engaged in trade or commerce, even if the underlying transaction between the parties is not in the ordinary course of the Defendant's business.  *See e.g.*, *Lantner* v. *Carson*, 373 N.E.2d 973, 976-77 (Mass. 1978); *Begelfer* v. *Najarian*, 409 N.E.2d 167, 176 (Mass. 1980).  Here, the parties do not contest that the Defendant, an insurance company, was engaged in "trade or commerce" when it sold Plaintiffs the insurance policy, and subsequently when it assessed their claim. Farm Insurance's conduct therefore falls within the scope of chapter 93A.

same entitlement to aggrieved consumers."[5]  *Cont'l Ins. Co.* v.

*Bahnan*, 216 F.3d 150, 156 (1st Cir. 2000).  As potentially

relevant here, there are two material differences between an

action brought under section 9 and one brought under section 11.

First, under section 11, the plaintiff must show that it

suffered a "loss of money or property, real or personal."

M.G.L. c. 93A § 11.  There is no parallel requirement under

section 9.  M.G.L. c. 93A § 9.  Second, "[a] violation of

chapter 176D may form the predicate for a cause of action under

section 9 . . . but not under section 11."  *Cont'l Ins.*, 216

F.3d at 156.  Otherwise, the standard for determining whether

conduct was "unfair or deceptive" remains the same.

    The question whether a party is engaged in trade or

commerce, and therefore whether a party must sue under

section 11, "is a question of fact."  *Kunelius* v. *Town of Stow*,

588 F.3d 1, 16 (1st Cir. 2009).  For a suit under chapter 93A to

fall under section 11, rather than under section 9, the

underlying transaction must have "occurred in a business

context," as determined by the "circumstances in each case, such

as the frequency of similar transactions, the motivation behind

the transaction, and the role of the participant in the

_____

[5] Indeed, section 9 specifically gives a private right of action
to "[a]ny person, other than a person entitled to bring action
under section 11 . . . who has been injured" by an unfair or
deceptive trade practice.  M.G.L. c. 93A § 9

transaction." *Id.* at 16 (citing *Begelfer* v. *Najarian*, 409
N.E.2d 167, 175 (Mass. 1930)).

Here, neither party has specifically addressed the question
whether the Plaintiffs were engaged in "trade or commerce;"
indeed, the Plaintiffs did not specify which of the two
provisions they were invoking when filing their Amended
Complaint, choosing instead simply to list both sections. Nor
is the kind of relief Plaintiffs seek barred by either
provision; the Plaintiffs, at least at the pleading stage,
alleged sufficient facts to show they suffered "loss of money or
property" as a result of the Defendant's actions.

The record before me nevertheless raises a dispute about
the proper characterization of the Plaintiffs' operations at
River Farm. On the one hand, Mr. and Mrs. DeRensis lived at the
insured property; it was their primary residence, and a realty
trust is a relatively common instrument in Massachusetts through
which individuals can hold title to real property without using
that property for a commercial purpose. *See Discover Realty
Corp.* v. *David*, 2003 Mass. App. Div. 172, 2003 WL 22387138 at *2
(Mass. App. Div. Oct. 14, 2003).

However, the property was, by the terms of the insurance
agreement, at least nominally being used as a farm, though the
farm was run by a separate LLC. In this connection, Mr.
DeRensis referenced his "employees" being present on the

property when the damage took place.  At least part of the property was also offered for rent, meaning the Plaintiffs were, at least in part, engaged in trade or commerce under Massachusetts law.  *Con'l Ins.*, 216 F.3d at 156 (citing *Linthicum* v. *Archambault*, 398 N.E.2d 482, 487 (Mass. 1979) ("[A] person who rents real property is engaged in 'trade' or 'commerce.'"), *overruled on other grounds by Knapp Shoes, Inc.* v. *Sylvania Shoe Mfg. Corp.*, 640 N.E.2d 1101 (Mass. 1994)).

In any event, if I find, as I do below, that Farm Insurance did not, in fact, engage in unfair or deceptive practices, I need not resolve the question of whether the Plaintiffs were engaged in "trade or commerce" under the statute.  *See infra*. Because the issue has not been raised or briefed by the parties, I have no need to resolve it to decide the motion before me.

Although Massachusetts law does not provide a "static definition of the term 'deceptive'," the Supreme Judicial Court has consistently held that a practice is unlawful under the statute if "it 'could reasonably be found to have caused a person to act differently from the way he [or she] otherwise would have acted.'"  *Aspinall* v. *Philip Morris Cos.,* 813 N.E.2d 476, 486 (Mass. 2004) (quoting *Purity Supreme, Inc.* v. *Attorney Gen.,* 407 N.E.2d 297, 307 (Mass. 1980)).  A practice is "unfair" if "it is (1) within the penumbra of a common law, statutory, or other established concept of unfairness; (2) immoral, unethical,

oppressive, or unscrupulous; or (3) causes substantial injury to competitors or other business people." *Morrison* v. *Toys "R" Us, Inc.,* 806 N.E.2d 388, 392 (Mass. 2004) (quoting *Heller Fin.* v. *Ins. Co. of N. Am.,* 573 N.E.2d 8, 12-13 (Mass. 1991)).

For conduct to be actionable under Chapter 93A, it "must rise to the level of an 'extreme or egregious' business wrong." *Peabody Essex Museum, Inc.* v. *U.S. Fire Ins. Co.*, 802 F.3d 39, 54 (1st Cir. 2015). "Simple breach of contract is not sufficiently unfair or deceptive to be alone a violation of Chapter 93A." *Incase Inc.* v. *Timex Corp.*, 488 F.3d 46, 56 (1st Cir. 2007). There must be something more. In deciding whether conduct is "unfair" or "deceptive" under the statute, the Supreme Judicial Court has made clear that the focus on the inquiry should be "on the nature of the challenged conduct and on the purpose and effect of that conduct," and on whether the conduct "had a coercive quality that, with the other facts, warranted a finding of unfair acts or practices." *Mass. Employers Insurance Exchange* v. *Propac-Mass, Inc.*, 648 N.E.2d 435, 438 (Mass. 1995).[6]

---

[6] For a period beginning in 1979, courts in the Commonwealth held that, to constitute a violation of chapter 93A, "[t]he objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." *Levings* v. *Forbes & Wallace, Inc.*, 396 N.E.2d 149, 153 (Mass. App. Ct. 1979) (Kass, J.); *see also, e.g. Spence* v. *Boston Edison Co.*, 459 N.E.2d 80, 88 (Mass. 1983). The Supreme Judicial Court in 1995 rejected this

Even under section 11, which requires some "concrete monetary or property loss," a plaintiff who succeeds in showing that the defendant engaged in an "unfair or deceptive" practice does not also "[have] to prove that the loss remains uncompensated." *Auto Flat Car Crushers, Inc.* v. *Hanover Insurance Co.*, 17 N.E.3d 1066, 1075-76 (Mass. 2014). Though "acceptance of a defendant's tender of payment may affect the continued viability of a plaintiff's contract claims, such acceptance does not vitiate a claim under G.L. c. 93A as a matter of course, unless the latter claim has been expressly settled." *Id.* at 1076 (internal citations omitted). Therefore, "[t]o the extent that a plaintiff already has received compensation for its underlying loss prior to the resolution of its G.L. c. 93A claim, such compensation has been treated as an offset against any damages ultimately awarded, rather than as a bar to recovery." *Id.* at 1077.

### 2.  Chapter 176D

While chapter 93A applies broadly to all business relationships, chapter 176D sets forth a specific prohibition

---

formulation as "uninstructive," and instead required courts to "focus on the nature of challenged conduct and on the purpose and effect of that conduct." *Mass. Employers Insurance Exchange* v. *Propac-Mass, Inc.*, 648 N.E.2d 435, 438 (Mass. 1995). The First Circuit has similarly abrogated the "rascality" standard. *See e.g.*, *NASCO, Inc.* v. *Public Storage, Inc.*, 127 F.3d 148, 152 (1st Cir. 1997); *Baker* v. *Goldman, Sachs & Co.*, 771 F.3d 37, 51 (1st Cir. 2014).

against the use of "an unfair method of competition or an unfair
or deceptive act or practice in the business of insurance."
M.G.L. c. 176D, §2. The statute defines "unfair methods of
competition and unfair or deceptive acts or practices in the
business of insurance" to include "[u]nfair claim settlement
practices." *Van Dyke* v. *St. Paul Fire and Marine Ins. Co.*, 448
N.E.2d 357, 360 (Mass. 1983) (quoting M.G.L. c. 176D § 3(9)).[7]

The statute was specifically "'designed to remedy a host of
possible violations in the insurance industry' [and] 'to subject
insurers committing violations to the remedies available to an
injured party under G.L. c. 93A.'" *Morrison,* 806 N.E.2d at 390
(quoting *Hopkins* v. *Liberty Mut. Ins. Co.,* 750 N.E.2d 943, 952
(Mass. 2001)). The goal was to "'encourage settlement of
insurance claims . . . and discourage insurers from forcing
claimants into unnecessary litigation to obtain relief.'" *Id.*
(quoting *Hopkins*, 750 N.E.2d at 948). As a consequence, "[a]
right of action under c. 93A for a violation of G.L. c. 176D,
reflects 'the commonplace ethical view that a claims facilitator

---

[7] M.G.L. c. 176D § 3(9) lists several specific acts that can form
the basis for liability, and a single act, in violation of one
subsection of section 3(9), is sufficient. *Van Dyke* v. *St. Paul
Fire and Marine Ins. Co.*, 448 N.E.2d 357, 360-61 (Mass. 1983 ).
However, the decisions of the Supreme Judicial Court in this
area suggest that, because of its structure, the individual
subsections of section 3(9) will be read narrowly. *See, e.g.*,
*id.* at 361-62; *Morrison* v. *Toys "R" Us, Inc.*, 806 N.E.2d 388,
390-91 (Mass. 2004).

ought not wear out the claimant by unduly delaying settlement

when liability is clear.'" *Pacific Indem. Co.* v. *Lampro,* 12

N.E.3d 1037, 1044 (Mass. App. Ct. 2014) (quoting *Miller* v. *Risk*

*Management Foundation of the Harvard Med. Institutions, Inc.*,

632 N.E.2d 841, 846 (Mass. App. Ct. 1994)).

Consequently, a *consumer* bringing a claim under chapter 93A

"may recover for violations of [M.G.L. c. 176D] without regard

to whether the violation was [independently] unlawful under G.L.

c. 93A § 2." *Polaroid Corp.* v. *Travelers Indem. Co.,* 610 N.E.2d

912, 917 (Mass. 1993). However, when suit is filed under M.G.L.

c. 93A § 11 by a party engaged in "trade or commerce," there is

no independent right to recover for violations of M.G.L.

c. 176D. *Id*. Violations of M.G.L. c. 176D "constitute[ ] only

probative evidence, not per se proof, of egregious business

misconduct." *Peabody Essex Museum, Inc.,* 802 F.3d at 54; *see*

*also Cont'l Ins.*, 216 F.3d at 156 ("A violation of chapter 176D

may form the predicate for a cause of action under section 9 of

chapter 93A, but not under section 11.").

As stated above, I need not decide whether Plaintiffs are

entitled to seek relief under M.G.L. c. 93A § 9 and

consequently, whether they can claim an independent right of

action under M.G.L. c. 176D. Rather, I focus my attention on

whether the facts, as alleged, could lead a reasonable fact-

finder to conclude that the insurer's conduct violated the

mandates of M.G.L. c. 176D and therefore, constituted an "extreme or egregious business wrong" giving rise to liability under chapter 93A. *See Peabody Essex Museum*, 802 F.3d at 54.

### 3. The Present Dispute

In the present matter, the Plaintiffs alleged four specific violations of G.L. c. 176D § 3(9): They allege that the insurer "(1) [failed] to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies;" (2) "[refused] to pay claims without conducting a reasonable investigation based upon all available information;" (3) "[failed] to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed;" and, (4) "[failed] to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear."

Reading these statutory provisions narrowly, *see supra* n. 7, I address each allegation in turn.

> a. *Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies*

Although an insurance adjuster was not sent to the insured premise until May 20, 2015, several months after the damage occurred, Farm Insurance reasonably explained the delay; the insurance company inadvertently interchanged the numbers associated with two different policies and had accidentally

21

merged Plaintiffs' claims into a single one.  Mr. Chilton's correspondence with Mr. DeRensis indicated that Farm Insurance inadvertently misplaced Plaintiffs' claim.  Not only did he apologize for the confusion and delay; he also stated, "I will work to see you receive our coverage determination ASAP." Though these record-keeping errors at the outset delayed the insurance company in sending an adjuster and resolving the claims, it does not descend to the level of an "'extreme or egregious' business wrong" that can give rise to liability under section 93A.  *Peabody Essex Museum, Inc.*, 802 F.3d at 54.

The Plaintiffs later discovered a similar record-keeping error when, in response to Mrs. DeRensis's email to Mr. Dineley about her dissatisfaction with the handling of Plaintiffs' claim, he stated that he had her claim confused with another "Linda" in NJ.  For his part, Mr. Dineley apologized for the confusion.  Following this communication, a new adjuster, Mr. Grandmont, was appointed who immediately followed up with Mrs. DeRensis, and again apologized for any confusion there may have been.  Though the insurer was certainly careless and perhaps subcompetent in processing the Plaintiffs' claims, there is no indication the insurance company appointed Dineley Claim Services in other than good faith, and Farm Insurance timely responded to the communications from the Plaintiffs.

The statute requires nothing more in this setting.  The statute prevents insurance companies from ignoring their clients but does not require the company to respond in a particular way. While the company's response can give rise to liability under a different section of M.G.L. c. 176D § 3, it does not under this particular provision.  *See, e.g.*, *Capitol Specialty Insurance Corp.* v. *Higgins*, 203 F. Supp.3d 200, 209 (D. Mass. 2016).

Indeed, here, Mr. and Mrs. DeRensis waited several months before contacting Scott Howard and Farm Insurance after getting the initial estimate from Dineley Claim Services.  There is also no contention by Plaintiffs here that the insurance company dragged its feet and refused to participate in the Reference once Plaintiffs had invoked that procedure (as was their right under Massachusetts law), or that the insurance company otherwise failed to act in good faith as part of that procedure. Indeed, Plaintiffs also concede that, once the Reference award was final, the insurance company paid what was owed under the insurance contract in a timely fashion.

The company's conduct also does not constitute an "extreme or egregious business wrong;" nor does it "have a coercive quality" that would suggest an intent to extort the policy holder.  *See Mass*. *Employers Insurance Exchange*, 648 N.E.2d at 438; *Peabody Essex Museum, Inc.*, 802 F.3d at 54.  At all points,

the Plaintiffs could control the timing of restitution by calling for a reference.

> b. *Refusing to pay claims without conducting a reasonable investigation based upon all available information*

Plaintiffs have also failed to present evidence to show that Farm Insurance's investigation was unreasonable. At most, the Plaintiffs have shown that the parties disagreed about the amount owed under the insurance policy. Plaintiffs, of course, contend that the discrepancy between the estimates is evidence that the insurer's investigation was unreasonable.

The record shows that Farm Insurance undertook what would constitute a reasonable investigation in contested circumstances. Indeed, following the May 4, 2015 "Claim Report Acknowledgment" letter, Farm Insurance assigned Dineley Claims Service, an independent company, which then assigned Mr. Whidden to perform the initial field investigation and loss adjustment later that same month.

Even if Mr. Whidden's initial investigation and assessment of the damage could itself somehow be characterized as unreasonable, as Plaintiffs contend, Farm Insurance still sought a second inspection of the premise once Plaintiffs made their dissatisfaction with the original estimate known. Indeed, there was a second inspection and a second estimate, with which Plaintiffs again disagreed.

When the parties could not come to an agreement about the proper amount owed, a Reference was conducted, as anticipated by both the insurance contract and by state law. Plaintiffs could have sought a Reference once it was clear that the parties disagreed about the value of the claim, here at the latest by November 24, 2015. *See Employer's Liability Assur. Corp.* v. *Traynor*, 237 N.E.2d 34, 34 (Mass. 1968) (rescript) (holding that an insured party must seek a reference before filing suit in court over an insurance dispute); *Kiley* v. *Metropolitan Property and Casualty Ins. Co.*, 159 F. Supp. 3d 135, 142-43 (D. Mass 2016) (same, and also holding that the insured has the right to invoke the reference procedure when there is a significant disagreement as to the loss amount). Plaintiffs do not suggest that the insurance company acted in bad faith during the Reference, or otherwise prevented them from seeking a Reference to resolve the dispute under Massachusetts law.

Farm Insurance abided by the mandate of the Reference award and paid Plaintiffs the amount it was obligated to pay under the policy. It also paid an additional $7,766.58, representing the interest which would have accrued on the amount owed under the award during the pendency of the dispute after Plaintiffs' counsel sent a demand letter with the hope of resolving any lingering dispute without litigation. This amount was tendered even though Plaintiffs did not sign a release, as requested by

Farm Insurance. Based on the record before me, Farm Insurance can hardly be held liable for failing to conduct a reasonable investigation or pay claims based on the outcome of that investigation.

> ### c. Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed

It is undisputed that Plaintiffs never furnished Farm Insurance with a signed, sworn statement of proof of loss, as required by M.G.L. c. 175, § 99. Because this document was never completed, Farm Insurance cannot be held liable for failing to affirm or deny coverage of a claim that depends on the document, even if it may be liable under other provisions of chapter 176D. *See* M.G.L. c. 176D § 3(9)(e).

> ### d. Failing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear

Massachusetts law recognizes that an insurer is "not required to put a fair and reasonable offer on the table until liability and damages [are] apparent." *Bobick* v. *U.S. Fidelity and Guar. Co.,* 790 N.E.2d 653, 659 (Mass. 2003). It is clear from the record that, until the Reference award was issued, there was an unresolved difference of opinion about the level of Farm Insurance's damages, especially because of the disparity between the various estimates proposed by different adjusters. Nonetheless, even if the final loss measurements were lower than

initially proposed by Farm Insurance, the figures were the product of not one, but two on-site field visits and further discussions with the Plaintiffs through counsel. Farm Insurance's conduct does not evidence a failure to effectuate the prompt settlement of claims after liability was reasonably established. It certainly does not evidence an absence of good faith or the presence of extortionate tactics.

Consequently, Farm Insurance cannot be held liable for failing to promptly settle the insured's claims once the amount of damages became apparent.

### e. Conclusion

Because Farm Insurance has shown that there is no genuine dispute as to any material fact regarding this claim, it is entitled to judgment as a matter of law with respect to liability regarding Plaintiffs' chapter 93A claims.

### 4. Damages

Because I have determined that Plaintiffs cannot prevail as to liability on the unfair practices claims, Plaintiffs' arguments as to damages also must necessarily fail. In the interest of completeness, I will only observe briefly that even if the Plaintiffs' unfair practice claims could go forward, Plaintiffs would not be entitled to the kind of recovery sought.

Plaintiffs here seek reimbursement of the fees and expenses they incurred as a result of the "unnecessary" Reference, the

difference between the insurance company's original loss calculation and the aggregate award ultimately issued by the Referees, and both punitive damages and attorney's fees for the insurance company's violations of M.G.L. c. 93A. I note at the outset that the Reference, of course, far from being unnecessary, was a mandated procedure for resolving disputes in this context. Thus, damages are not available for necessary recourse to the mandated procedure.

More particularly, there is no allegation here that the Reference process violated the requirements set forth in the contract, so there is no basis for concluding Plaintiffs would be entitled to recover costs associated with that process. Moreover, Plaintiffs agree that the insurance company paid the full amount of the actual cash value of the building, plus interest, so any entitlement to the difference between that value and the insurance company's initial estimate would be a form of double recovery without independent justification as a damage issue.

Finally, Plaintiffs would only be entitled to punitive damages for a violation of M.G.L. c. 93A if the alleged deception giving rise to liability was "willful or knowing." *Incase Inc.*, 488 F.3d at 58. Even if what might be characterized as the insurance company's initial subcompetence could be considered so egregious as to constitute some form of

unfair trade practice, it certainly was not akin to "coercion or extortion, . . . fraud and similar forms of misrepresentation . . . or [ ] abusive litigation." *Id*. (internal citations omitted). Plaintiffs would therefore not be entitled to punitive damages.

At most, Plaintiffs could recover attorneys' fees under the statute had their chapter 93A claims been successful. *See, e.g.*, *RFF Family Partnership, LP* v. *Link Development, LLC*, 2015 WL 1672253 at *3 (D. Mass. March 31, 2015). However, even though chapter 93A would entitle Plaintiffs, were they to prevail, to "reasonable attorney's fees and costs", the amount of attorney's fees "is largely discretionary" and is based, at least in part, on the amount of damages involved and the nature of the case and issues presented. *Linthicum*, 398 N.E.2d at 488. Plaintiffs would also be entitled only to any fees associated with the present chapter 93A claims and could not recover any costs associated with the Reference. *See Shultz* v. *Subaru of America, Inc.*, 553 N.E.2d 893, 893-94 (Mass. 1990) (rescript). Nothing in the record of this case seems to justify awarding anything more than nominal fees to Plaintiffs.[8]

_____

[8] The SJC has been clear that a plaintiff is only entitled to reasonable attorney's fees incurred in the process of litigating the chapter 93A claim, meaning Plaintiffs are not entitled to any fees or costs associated with the Reference, even if there is a dispute about whether, in forcing the plaintiff to a reference, the insurance company engaged in an unfair business

## IV. CONCLUSION

For the reasons set forth above, it is hereby ordered that Farm Insurance's motion for summary judgment be GRANTED.


/s/ Douglas P. Woodlock_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

---

practice. *See Shultz* v. *Subaru of America, Inc.*, 553 N.E.2d 893, 893_94 (Mass. 1990) (rescript). In the § 11 context, the SJC has also held that "a plaintiff must be entitled to some relief in some other respect in order to be entitled to an award of attorney's fees." *Jet Line Servs., Inc.* v. *American Employers Insurance Co.*, 537 N.E.2d 107, 115 (Mass. 1989) (referencing, and disapproving of, the approach taken in *Shapiro* v. *Public Service Mutual Insurance Co.*, 477 N.E.2d 146 (Mass. App. Ct. 1985), where attorney's fees were awarded though plaintiffs filing suit under § 11 had not proven damages). This "other relief" need not be damages if the plaintiffs sought, and had been awarded, injunctive relief, and the plaintiffs must only show that the unfair business practices had some "adverse effect upon the plaintiff, even if it is not quantifiable in dollars." *Id.* In the § 9 context, the statute sets a minimum amount of damages if a violation is found, so the same problem – where the plaintiff shows an unfair business practice but cannot prove damages – does not arise. In all events, even if the Plaintiffs were somehow to prevail on liability, as I found they do not, limited attorney's fees would be the only relief they could recover.